UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| United States of America, | Crim. No. 11-109 (PJS/JJG) |
| Plaintiff, | |
| v. | REPORT AND RECOMMENDATION |
| Antonius Brett El-X, | |
| Defendant. | |

---

JEANNE J. GRAHAM, United States Magistrate Judge

This matter came before the undersigned on June 22, 2011 for a pretrial motion hearing. Julie E. Allyn, Assistant United States Attorney, appeared for the United States of America. Matthew J. Mankey appeared for Defendant Antonius Brett El-X. This case is scheduled to be tried before the Honorable Patrick J. Schiltz, United States District Judge, on August 22, 2011.

I.  **BACKGROUND**

Defendant Antonius Brett El-X was charged by a Criminal Complaint on March 2, 2011, with violating the Hobbs Act, 18 U.S.C. § 1951(a). The Complaint specifically alleges that Defendant appropriated a taxicab from the driver, K.A., against K.A.'s will by means of actual and threatened force and by means of violence and fear of immediate injury to K.A.'s person. An Indictment charging the same was filed on March 22, 2011. The Indictment expounded slightly on the language in the Complaint and added that the taxi was engaged in interstate commerce.

    A.  **Affidavit of John R. Murnan II**

John R. Murnan II, an agent of the Bureau of Alcohol, Tobacco, Firearms, and Explosives, swore to the following facts in support of the Complaint. On January 29, 2011, Crystal, Minnesota, Police Department officers responded to a reported carjacking of a taxicab.

The driver, K.A., said he had been dispatched to pick up an individual at a hotel in Crystal. When he arrived, the individual asked to sit in the front seat and use K.A.'s phone, and K.A. agreed. The passenger was later identified as Defendant. As K.A. drove away from the hotel, Defendant placed his left leg over the center console, slammed on the brakes, and pushed K.A. toward the driver's side door. Defendant then moved his hand to his waist, leading K.A. to believe he was reaching for a gun. Defendant told K.A. to get out of the taxi or he would kill him. K.A. escaped, and Defendant drove away. K.A. ran to a nearby business and called the police. The taxi was equipped with GPS, which allowed officers to locate and pursue the taxi. Defendant crashed the taxi soon after the police gave chase. Officers found Defendant inside the vehicle, injured and unconscious, and the taxi was inoperable.

Agent Murnan interviewed the operations manager of the taxi company, Airport Taxi, Inc. He learned that the taxi company operates in Minnesota and routinely drives individuals across state lines and to the airport. Further investigation revealed that the taxi assigned to K.A. was manufactured in Canada; the computer equipment in the taxi was manufactured and repaired in Australia; the radio equipment was manufactured in Scotland; the meters came from Vermont; and the top lights were from New York.

### B.  Evidence Presented at the Pretrial Motion Hearing

Defendant was arrested at the scene of the crash and transported to the hospital. He could not be formally charged until he was medically cleared to leave the hospital, and police officers were assigned to keep guard over him until he was discharged. Crystal Police Officer Alan Watt was assigned to guard Defendant from approximately 7:00 p.m. to 10:30 p.m. on January 30, 2011. Officer Watt has worked as a police officer for the Crystal Police Department for fifteen years. His duties include patrolling and responding to calls.

Before Officer Watt went to the hospital, he was told that Defendant had been arrested for carjacking and had led law enforcement officers on a chase before crashing the cab. Officer Watt also learned that Defendant previously had been arrested for disarming a law enforcement officer. When Officer Watt arrived at Defendant's hospital room, he noticed that Defendant was handcuffed to the bedrail. Officer Watt reasoned this was to ensure safety and prevent Defendant from escaping.

Defendant asked Officer Watt if he could call his girlfriend. Officer Watt said no, because Defendant was in custody. Defendant then said he had gotten a "raw deal" on the disarming-an-officer charge, which he did not want to repeat. Officer Watt told Defendant not to talk. Defendant said he wanted to tell his side of the story, and Officer Watt told him again to stop talking, adding he would report Defendant's comments to his boss. But Defendant persisted in talking about disarming the deputy, and then began to talk about the alleged carjacking. Officer Watt warned Defendant a third time to stop talking and told Defendant it was not in his best interest to say anything, but Defendant said he wanted to tell his side of the story. Defendant said the cab driver had tried to increase the fare by taking a longer route. When Defendant confronted him, according to Defendant, the driver told Defendant to take the cab.

All in all, the interchange between Officer Watt and Defendant lasted about ten to fifteen minutes. Defendant was coherent and did not stutter or slur his words. Officer Watt did not ask Defendant any questions, nor did he make any threats or promises. At one point, though, Officer Watt made a face. The officer also watched Defendant as he spoke, because it was his assignment to watch Defendant. Officer Watt knew that Defendant was on medication, but he did not know the name or the dosage. Defendant did not appear to be in pain. Officer Watt saw several tubes protruding from Defendant, but no bandages or other signs of treatment or injury.

Officer Watt testified at the hearing that he wanted Defendant to stop talking. He explained that he was not assigned to the case, did not want to hear Defendant's story, and did not want to write a report. He knew Defendant was treading on treacherous ground, which is why he told him repeatedly to stop talking. He did not advise Defendant of his *Miranda* rights because he did not interrogate him and had no intention of doing so.

After Defendant finished talking, he took a nap. A nurse later entered the room and took Defendant's dinner order. Defendant understood the nurse's questions and coherently answered them. He ordered his dinner and ate it when it arrived.

### C.   Government's Pretrial Exhibit 1

According to Government's Pretrial Exhibit 1, Defendant was born in April 1967, making him forty-three years old on January 30, 2011. He has an extensive history with law enforcement and the justice system, having been convicted of numerous crimes including robbery and aggravated robbery in 1987, theft in 1990, attempted simple robbery in 1994, aggravated robbery in 1995, fleeing a police officer in a motor vehicle and third-degree assault in 2004, fourth-degree assault in 2005, fourth-degree assault in 2008, and three controlled substance crimes in 2010.

## II.   DISCUSSION

The dispositive motions presently before the Court are Defendant's Motion to Suppress Statements and Motion to Dismiss for Lack of Jurisdiction.

### A.   Motion to Suppress Statements

The Government cannot use a defendant's statement to a police officer made pursuant to interrogation in a custodial setting unless the officer first advised the defendant of certain rights. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Statements made voluntarily, "that are not the

product of any interrogation by the police," by a person in custody are an exception to the exclusionary rule. *United States v. Waloke*, 962 F.2d 824, 829 (8th Cir. 1992) (citing *Rhode Island v. Innis*, 446 U.S. 291, 299-301 (1980)); *see also Miranda*, 384 U.S. at 478 ("Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence."). "Interrogation," as contemplated by *Miranda*, can be "either express questioning or its functional equivalent." *Innis*, 446 U.S. at 300-01. The latter standard incorporates an officer's words or actions, other than those normally incident to custody, which the officer "should know are reasonably likely to result in an incriminating response." *Id.* at 301. "Polite conversation is not the functional equivalent of interrogation." *United States v. Tail*, 459 F.3d 854, 858 (8th Cir. 2006).

There is no dispute that Defendant was in custody when he made the statements to Officer Watt. With respect to the interrogation requirement, Defendant argues that Officer Watt should have known that his conduct in the hospital room was reasonably likely to elicit an incriminating statement. The Court disagrees. Officer Watt did not ask any questions or steer Defendant toward potentially incriminating topics. *See id.* The only comments Officer Watt made were to deny Defendant's request to call his girlfriend, to tell him three times to stop talking, to warn Defendant that he would report any comments to his boss, and to advise Defendant that it was not in his best interest to talk. If anything, Officer Watt's comments were designed to inhibit Defendant from making incriminating statements. As for Officer Watt's facial gesture and attentiveness to Defendant as he spoke, these actions were no more than a polite response to Defendant's spontaneous statements. Considered in their entirety, the circumstances did not rise to the level of interrogation.

Defendant next argues that his statements were not voluntary because he was in pain and taking medication. A defendant's statement is involuntary if his will was overborne and his capacity for self-determination was critically impaired. *United States v. Pierce*, 152 F.3d 808, 812 (8th Cir. 1998). Voluntariness is assessed in light of all the circumstances, including the level of coercion by the police, the length and setting of the encounter, and the defendant's personal characteristics. *Smith v. Bowersox*, 311 F.3d 915, 922 (8th Cir. 2002). A statement made by a person under the influence of medication is not necessarily involuntary. *United States v. Harden*, 480 F.2d 649, 651 (8th Cir. 1973). As long as the person's will was not overborne and the officer did not engage in coercive activity, even a defendant who is hospitalized and medicated may give a voluntary statement. *See United States v. New*, 491 F.3d 369, 374 (8th Cir. 2007).

The evidence before the Court demonstrates that Defendant's will was not overborne, despite his injuries and medicated state. He spoke to Officer Watt no longer than fifteen minutes. He was coherent, did not stutter or slur, and did not complain of being in pain. Although Officer Watt knew that Defendant was taking medication, he did not know what it was or the dosage. When the nurse was present, Officer Watt observed that Defendant understood her questions, ordered his dinner, and ate it. Defendant was forty-three years old at the time and had extensive prior experience with law enforcement and the justice system. The element of coercive activity is also absent. Indeed, Officer Watt repeatedly tried to stop Defendant from talking, but Defendant was adamant about telling his side of the story.

The totality of the circumstances demonstrate that Defendant's statements were made voluntarily and not as a result of interrogation, the equivalence of interrogation, or coercion. Accordingly, the Court recommends that Defendant's motion to suppress statements be denied.

B.     **Motion to Dismiss for Lack of Jurisdiction**

Defendant moves to dismiss the Indictment for lack of jurisdiction. He asserts that a federal charge for an alleged robbery of a taxicab does not comport with the legislative policy underlying the Hobbs Act and thereby inappropriately federalizes a state crime. He also contends that the charge violates the United States Attorneys' Manual, § 9-131.040.

The Hobbs Act provides in relevant part:

> (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.
>
> (b) As used in this section--
>
>> (1) The term "robbery" means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining.
>>
>> . . .
>>
>> (3) The term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.

18 U.S.C. § 1951. The statute's "broad language" manifests "a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence." *Stirone v. United States*, 361 U.S. 212, 215 (1960).

Defendant's policy argument is squarely foreclosed by *United States v. Farmer*, 73 F.3d 836 (8th Cir.), *cert. denied*, 518 U.S. 1028 (1996). In *Farmer*, the defendant was convicted under

the Hobbs Act with conspiracy and attempting to rob a convenience store. He argued that a "garden-variety, single local robbery" was "not the kind of thing Congress intended to reach in the Hobbs Act." *Id.* at 843. In rejecting this argument, the court focused on the statutory language, not Congress's motivation.

> The important point, though, is not what motivated Congress to pass the Hobbs Act, but rather what the Hobbs Act says. Its words in no way exclude prosecutions for single local robberies, so long as they satisfy the requirement that commerce or the movement of any article or commodity in commerce is obstructed, delayed, or affected, always understanding that by "commerce," in this context, is meant "interstate commerce."

*Id.* The court noted that the main warehouse of the convenience store chain was in Iowa, but that the chain sold products from all fifty states and had stores in seven states. *Id.* "We have no doubt of the power of Congress to protect from violence businesses that are part of an interstate chain." *Id.* As to the sufficiency of the indictment, the court found it was not defective because it alleged an effect on interstate commerce. *Id.* at 843-44.

The Eighth Circuit's later decision in *United States v. Williams*, 308 F.3d 833 (8th Cir. 2002), is notable for its similar facts. There, the defendant called for a taxicab and robbed the driver by knifepoint in a parking lot. *Id.* at 835. The defendant was charged under the Hobbs Act with interfering with interstate commerce by violence. *Id.* at 836. To prove the element of interstate commerce at trial, the government showed the following:

> Morgan's cab bore the logo of "Century Cab Company." Independent cab owners pay a fee to use the Century Cab name and dispatch service. The cab Morgan was driving at the time of the robbery was owned by Robert Snyder. Morgan was engaged in a commercial enterprise of providing transportation services for hire, and Snyder was involved in a commercial enterprise because of his interest in the proceeds from the cab trips and was responsible for expenses of the enterprise. Most of the cab fare revenue was used to buy gasoline, which moved through interstate commerce. Snyder purchased insurance for the cab from an out-of-state company. Morgan and Snyder frequently transported Federal Express employees, railroad crew members, and packages that were moving in interstate commerce. Morgan also regularly transported passengers to and from the Eastern Iowa

>Airport. The robbery forced the cab to be shut down during the time when lucrative trips to the airport were likely to occur.

*Id.* at 836.

*Williams* is not on point because the issue on appeal was a jury instruction on interstate commerce, not the sufficiency of the indictment. *Id.* at 837. But it is nonetheless useful in the present case to show that a violation of the Hobbs Act may be charged for the robbery of a taxicab driver.

Turning to the facts of this case, the Indictment charges Defendant with Interference with Commerce by Robbery under the Hobbs Act. The Indictment alleges that Defendant forcibly took personal property, a taxicab, from the driver against the driver's will by actual and threatened force, violence, and fear of immediate injury. The Indictment further alleges that the taxi was engaged in interstate commerce and that Defendant obstructed, delayed, and affected that interstate commerce by robbery. This is sufficient to charge an offense under 18 U.S.C. § 1951(a), thereby establishing federal jurisdiction. *See United States v. Woodruff*, 296 F.3d 1041, 1046 (11th Cir. 2002); *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998). Whether the Government's evidence will satisfy the elements of § 1951(a) is a question for trial, *see Alfonso*, 143 F.3d at 776-777, although the Court notes the Government's intention to introduce evidence similar to that admitted in *Williams*.

Defendant's final argument for dismissal is that the Indictment violates § 9-131.040 of the United States Attorneys' Manual. For his position, Defendant relies on a concurring opinion in *United States v. Dobbs*, 449 F.3d 904 (8th Cir. 2006) (Heaney, J., concurring). Judge Heaney opined that asserting federal jurisdiction over a single, local robbery contravened the United States Attorneys' Manual's stated policy to exercise jurisdiction under § 1951(a) "*only* in instances involving organized crime, gang activity, or wide-ranging schemes." *Id.* at 915

(quoting United States Attorneys' Manual § 9-131.040) (emphasis in *Dobbs*). Although Judge Heaney ultimately agreed that federal jurisdiction existed, he simply wished to question why the United States Attorney chose to exercise it. *Id.*

Judge Heaney's concurrence provides no basis to dismiss the Indictment in this case. Not only does federal jurisdiction exist, but a violation of the United States Attorneys' Manual would not provide a ground to dismiss the charge, *see United States v. Gross*, 41 F. Supp. 2d 1096, 1098 (C.D. Cal. 1999).

### III. RECOMMENDATION

Accordingly, **IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion to Suppress Statements (Doc. No. 57) be **DENIED**; and

2. Defendant's Motion to Dismiss for Lack of Jurisdiction (Doc. No. 66) be **DENIED**.

Dated: July 6, 2011

                                                s/ *Jeanne J. Graham*
                                                JEANNE J. GRAHAM
                                                United States Magistrate Judge

### NOTICE

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing and serving specific, written objections by **July 21, 2011**. A party may respond to the objections within fourteen days after service thereof. Any objections or responses filed under this rule shall not exceed 3,500 words. The district judge shall make a de novo determination of those portions to which objection is made. Failure to comply with this procedure shall forfeit review in the United States Court of Appeals for the Eighth Circuit. Unless the parties are prepared to stipulate that the district judge is not required to review a transcript of the hearing in order to resolve the objections, the party making the objections shall timely order and cause to be filed within ten days a complete transcript of the hearing.